D7i9aera

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  AEROTEL, LTD.,

4             Plaintiff,

5        v.                              13 CV 2299 (PAE)

6  IDT CORPORATION,

7             Defendant.

8  ------------------------------x
                                        New York, N.Y.
9                                       July 18, 2013
                                        3:07 p.m.
10
   Before:
11
                      HON. PAUL A. ENGELMAYER
12
                                              District Judge
13
                           APPEARANCES
14
   OSTRAGER CHONG FLAHERTY & BROITMAN P.C.
15      Attorneys for Plaintiff
   BY:  GLENN F. OSTRAGER
16          JOSHUA S. BROITMAN

17 REED SMITH LLP
        Attorneys for Defendant
18 BY:  CASEY D. LAFFEY
          JORDAN W. SIEV
19

20

21

22

23

24

25

D7i9aera

1           (In open court; case called)

2           THE COURT:  Good afternoon.  We're here for oral

3   argument on petitioner's application.  So I guess I'll hear

4   first from Mr. Ostrager.

5           MR. OSTRAGER:  Thank you, your Honor.

6           THE COURT:  For what it's worth, I'm not looking for a

7   lengthy argument.  I'm happy to hear argument.  But, fair

8   warning, use your time advisedly.

9           May I just begin though before -- I'll let you teach

10  me about the merits as you want, but if I may begin.  The

11  redactions that are requested here are uncommonly broad

12  without, I think, an obvious reason apparent to the Court as to

13  why such sweeping redactions are merited.

14          Without detaining us too much on that can you explain

15  briefly why the redactions are so necessary here.

16          MR. OSTRAGER:  Your Honor, petitioner does not require

17  any redactions.

18          THE COURT:  I see.

19          MR. OSTRAGER:  Agreed to these redactions because it

20  was part of -- the parties' agreement which is in controversy

21  provided for confidentiality.  And the arbitration was also

22  subject to a protective order.  So we complied with the terms

23  of protective order and deferred to respondent IDT as to what

24  they required.

25          THE COURT:  Let me then say to respondent when it

D7i9aera

1    comes your time at the very top, I'd appreciate a brief

2    explanation.

3              I have a fair amount of sensitivity to business needs

4    for redaction.  On the other hand, if I'm missing something

5    here, this looks like very much of a retrospective controversy,

6    indeed dating back through several settlement agreements.  And

7    so on the face of it, it wasn't obvious to me why it was that a

8    redaction was needed, for example, to avoid anticompetitive

9    conduct or something of that ilk.  So I'm happy to hear now

10   that we're in district court and we're not in arbitration

11   anymore what the reason is for the scope of the redaction.

12             In any event let's get going with you, Mr. Ostrager.

13             MR. LAFFEY:  Thank you, your Honor.

14             MR. OSTRAGER:  Your Honor, we have three

15   demonstratives and if I could approach the bench I have a copy

16   of it which I can hand up.

17             THE COURT:  Sure.  Have you given them to your

18   adversary?

19             MR. OSTRAGER:  I'm going to right now.

20             THE COURT:  Have you an extra for my law clerk.

21             MR. OSTRAGER:  I do.  I have several.

22             Your Honor, this case is a contract -- a dispute

23   concerning a distribution agreement relating to prepaid --

24   international domestic prepaid calling cards.  And the papers

25   describe what a prepaid calling card is.  I'm pleased to

D7i9aera

1    address it if the Court would like further explanation

2    concerning how these cards work.

3           THE COURT:  I may at some point.  Let's see if it

4    becomes necessary.

5           MR. OSTRAGER:  Aerotel's claim consisted of -- sought

6    relief of $8 million for domestic prepaid calling cards and $12

7    million for international.  So the claims of breach against

8    IDT, an arbitration panel held that IDT materially breached the

9    contract and that Aerotel properly elected to terminate the

10   contract and seek legal remedies.  That's set forth in the

11   interim award, which is Exhibit 1 to the Flaherty declaration.

12          The panel, by a vote of two to one, denied Aerotel's

13   legal remedy of restitution with respect to the domestic

14   portion of the agreement and then further held that with

15   respect to its alternative claim for lost profit that it had

16   not been established and, therefore, no remedy was provided for

17   the domestic.

18          THE COURT:  Let me interrupt.  I'm just going to ask

19   you, because you're not speaking alongst the microphone, to

20   keep your voice up.  I'm sensitive to the others in the

21   courtroom and the court reporter and everything.

22          Here's my question about the restitution.  Explain to

23   me -- I understand restitution in the more garden variety

24   context in which that arises.  Here we have almost a chain of

25   agreements that goes back in effect after settlement agreements

D7i9aera

 1   following earlier breaches.  What does restitution mean in this

 2   context?

 3              MR. OSTRAGER:  Restitution -- the consideration for

 4   the 2009 agreement, which was the subject of the arbitration,

 5   was a release by Aerotel of claims that it had under a prior

 6   2007 agreement which also related to the distribution of

 7   prepaid calling cards.  And in consideration of releasing that

 8   obligation that IDT held, the parties entered into the 2009

 9   agreement.

10              The 2009 agreement, in Section 7, provides that

11   release claims under the prior agreement -- in an integration

12   clause, it provides that this is the entirety of the parties'

13   understanding.

14              To respond to your question precisely.  Restitution

15   means the benefit that Aerotel conferred on IDT as

16   consideration for the 2009 agreement.

17              Now, that consideration is measured by what Aerotel

18   gave up.  In providing a release of IDT's obligations --

19              THE COURT:  How is it clearly known that what Aerotel

20   gave up was determinably 8 million and 12 million as opposed to

21   arguably that?

22              MR. OSTRAGER:  Well under the 2007 agreement -- I

23   might add that the 2007 agreement is annexed --

24              THE COURT:  Mr. Ostrager, the absence of the

25   microphone may be causing a problem so if you're comfortable

D7i9aera

1    why don't you do it from there.

2           MR. OSTRAGER:  The 2007 agreement is annexed to the

3    Flaherty declaration, to the document the amended statement of

4    claim which is Exhibit 7.  Now, that document --

5           THE COURT:  Sorry.  Forgive me.  I've got the

6    supplemental Flaherty and I've got Flaherty.

7           MR. OSTRAGER:  The first declaration.

8           THE COURT:  Right.

9           MR. OSTRAGER:  And Exhibit 7.

10           THE COURT:  Right.

11           MR. OSTRAGER:  And if you turn to the end of the

12    amended statement of claim.

13           THE COURT:  Right.

14           MR. OSTRAGER:  There is, as Exhibit 2 to that

15    document.

16           THE COURT:  One moment.

17           MR. OSTRAGER:  A one-page 2007 settlement agreement,

18    or it's captioned binding settlement agreement.  And that

19    agreement --

20           THE COURT:  This is by hand.

21           MR. OSTRAGER:  It's a handwritten agreement,

22    negotiated between the principals of IDT and Mr. Eli Nhaissi,

23    who is the principal of Aerotel.  And this agreement settled a

24    long-standing patent litigation between the parties.

25           And under this agreement, IDT paid Aerotel $15 million

D7i9aera

1    in cash.  And then agreed to payment in kind of certain

2    telecommunication termination costs which could then be used by

3    Aerotel to market prepaid cards.  It is -- it's analogous to

4    the 2009 agreement.  But the central point of this agreement is

5    that it provided for IDT to deliver to Aerotel what is a

6    commodity in the telecommunications industry, $15 million in

7    telecommunication termination costs.  And there are very few,

8    if no, limitations on how Aerotel can use that termination

9    cost.

10            THE COURT:  Let me see if I understand this.  Under

11   this agreement, it's a little awkward because it's.

12            MR. OSTRAGER:  Handwritten.

13            THE COURT:  Handwritten, but under the agreement, is

14   IDT paying Aerotel $15 million in cash as well as --

15            MR. OSTRAGER:  Yes.

16            THE COURT:  -- providing.  Hold on.  Hold on.  As well

17   as providing $15 million of prepaid --

18            MR. OSTRAGER:  Yes.

19            THE COURT:  So those are two different

20   fifteen-million-dollar --

21            MR. OSTRAGER:  That's correct.

22            THE COURT:  So just to be clear.  What you're focusing

23   me on here is not the first provision where IDT pays Aerotel

24   the cash.  You're focusing on the second part where IDT --

25            MR. OSTRAGER:  That's correct.

D7i9aera

1              THE COURT:   -- provides Aerotel the cards.

2              Does Aerotel take on any obligations under this

3     agreement?

4              MR. OSTRAGER:   Aerotel receives the cards, the

5     telecommunication services, which it can then use to market

6     prepaid calling cards or it could actually sell the

7     telecommunication service.

8              THE COURT:   Here's the question for me.   Is what

9     Aerotel received under this agreement the functional equivalent

10    of all but liquid cash, or is it, as I understand the cards

11    were treated in the 2009 agreement, in effect a $15 million

12    credit that can be applied in effect to the charges by

13    carriers.

14             MR. OSTRAGER:   Well, it is a credit for services that

15    IDT was to provide to Aerotel in the form of telecommunication

16    services.   But what's interesting about this agreement is

17    that --

18             THE COURT:   But in other words, the cards -- is the

19    $15 million in cards in 2007 any different than --

20             MR. OSTRAGER:   Yes.

21             THE COURT:   -- the $15 million in cards in 2009?

22             In other words, 2009, it appears to me that the cards

23    are -- in effect the $15 million is a credit to be applied to

24    expenses due to third party carriers.

25             Is that the case with the 2007 cards?

D7i9aera

MR. OSTRAGER:  Well termination cost is an expense
that IDT assumes in terminating calls that consumers placed at
various locations, domestic or international.

THE COURT:  Right.  But what I'm trying to drive
out --

MR. OSTRAGER:  Out-of-pocket cost.

THE COURT:  What I'm trying to drive at is this.

In one scenario if you give me a card and it's got a
hundred dollars on it, it's basically a card that I can use in
whatever merchant I want, iTunes or something.  If I give me a
card that basically says this is -- this can be used in effect
to offset the cost of a third party, it's a somewhat more
limiting, perhaps, use that can be made.  And I understood the
value to Aerotel was not that it could go ahead and sort of
resell all these cards --

MR. OSTRAGER:  Yes.  That's the whole point of the
agreement.  Aerotel is a wholesaler, distributor.  It selects
what the various programs are going to be associated with, a
consumer product, and then it distributes them -- it can sell
them directly or through distributors, and you find them at
newsstands and in mass marketing concerns like Duane Reade.
And then you buy a card for two dollars or five dollars.  And
then you have five dollars, the consumer has five dollars of
telecommunication service available to them.

And so basically IDT is providing to Aerotel the

D7i9aera

```
 1   telecommunication service which Aerotel can then incorporate

 2   into a card and sell to the consumer.  You can sell termination

 3   costs as a commodity --

 4            THE COURT:  Forgive me.  But just going back to 2007.

 5   IDT -- Aerotel winds up receiving $15 million in cold hard cash

 6   and $15 million in these cards that it presumably can sell

 7   for --

 8            MR. OSTRAGER:  More than 15 million.

 9            THE COURT:  Well, okay.

10            What's in it for Aerotel not to just take the whole

11   thing in cold hard cash?

12            MR. OSTRAGER:  Well what's in it is because the $15

13   million in termination costs, which is IDT is a

14   telecommunications company like AT&T.  They're providing this

15   telecommunication service -- they're out-of-pocket costs.

16   They're providing the infrastructure at their offices to

17   process all the use of these cards by end consumers.  And

18   that's a very valuable service that they're providing.  And the

19   cards can be sold substantially in excess of $15 million.

20            THE COURT:  So what would a consumer pay for a $20

21   card typically?

22            MR. OSTRAGER:  A consumer might pay, for example,

23   $20 -- $10 for a 20-dollar card.  It might have --

24            THE COURT:  You're saying the consumer might pay

25   double the face value?
```

D7i9aera

1           MR. OSTRAGER:  Yes.

2           THE COURT:  What's the extra value that the consumer

3   is getting?

4           MR. OSTRAGER:  AT&T doesn't sell telecommunication

5   service that is out-of-pocket cost.  There's a profit.  This is

6   just a wholesale product, which is then sold at wholesale and

7   eventually winds up in the retail -- in retailers and sold for

8   substantially excess of the value of the telecommunication

9   service.

10          THE COURT:  I assumed that the profit for the AT&T was

11  built into the charge that they were passing along, the $20 for

12  a 20-dollar call; not that they needed to market a $15 --

13          MR. OSTRAGER:  $20 --  I'm sorry.

14          THE COURT:  You're going to have to avoid the

15  interrupting because it's impossible for the court reporter.

16  Go ahead.

17          MR. OSTRAGER:  A 20-dollar retailer card, half of it

18  might reflect telecommunication service, and then there's

19  profit built into it.

20          THE COURT:  Go ahead.

21          MR. OSTRAGER:  The gist of this was that the parties

22  couldn't reach agreement on $30 million.  And so Aerotel wanted

23  substantially more.  And they negotiated.  And there was an

24  agreement to pay in kind.  And so the telecommunication service

25  that was offered at wholesale, if Aerotel would take it and

D7i9aera

```
1    then market it, had a value substantially in excess of IDT's
2    out-of-pocket cost for the telecommunication service.  That was
3    the essence of this agreement.
4           A dispute arose between the parties as to the
5    construction of this agreement, which was addressed at the
6    arbitration, I might add, and as a result the parties entered
7    into the 2009 agreement.
8           The 2009 agreement, in turn, under that, Aerotel
9    received substantially less.  It agreed that it would share --
10           THE COURT:  Sorry.  Aerotel gets less?
11           MR. OSTRAGER:  Received substantially less under the
12    2009 agreement than it had under the 2007 agreement.
13           It agreed to share some of its profits with IDT.  It
14    agreed to -- and it agreed to various restrictions on how it
15    could market these cards to address concerns in terms of
16    pricing and so forth, to address concerns IDT had about
17    Aerotel's presence in the marketplace.  And so --
18           THE COURT:  Why -- just help me here.  Since you're
19    seeking restitution, you're seeking and measuring restitution
20    by the 2007 agreement, right?
21           MR. OSTRAGER:  That's correct.  The value --
22           THE COURT:  So if the parties in 2009 enter into a new
23    agreement that appears to presuppose some changed facts or
24    something that warrants a ratcheting down of the value of the
25    2007, what were those facts that resulted in the parties, in
```

D7i9aera

2009, agreeing on terms that are apparently by any measure

worth less money than the terms of 2007?

MR. OSTRAGER:  Well there were disputes concerning,

for example, whether -- a very principal dispute was whether

Aerotel under the 2007 agreement had to assume the obligation

for certain, what are referred to as SG&A costs.  And in the

arbitration it was determined that no, that was an obligation

under the 2007 agreement for IDT.

THE COURT:  Under what arbitration was that

determined?  This one?

MR. OSTRAGER:  This present arbitration.

THE COURT:  But the question I'm asking you is what

did the record show as to why the parties in 2009 entered into

an agreement that significantly discounted the benefit,

apparently, of Aerotel?

This is important because it's a little confusing to

me why you would go back to 2007 for restitution if in 2009

you've done a novation that basically operates materially to

your disadvantage, why that at least isn't the measure of your

relief.

MR. OSTRAGER:  Under a restitution theory, that's

synonomous with rescission, the 2009 agreement is canceled and

you look back to the --

THE COURT:  Sure.  But I mean the problem is that the

world hasn't stopped.  Two years, two important years have

D7i9aera

1    passed between 2007 and 2009.  And it stands to reason that

2    where there's a material change in the evident value of the

3    agreements, the parties are factoring in not merely what the

4    value of the 2007 agreement had been but facts that have

5    perhaps transpired afterwards.  And your theory of restitution

6    airbrushes out everything that happened in between.

7            MR. OSTRAGER:  Well the simple answer to that is that

8    Aerotel brought an action in federal court to enforce this

9    agreement.

10           THE COURT:  Right.

11           MR. OSTRAGER:  Litigation is expensive.  The parties

12   reached a settlement.  There were disputed terms concerning

13   what IDT's obligations were under this 2007 agreement, which

14   substantially impacted its value.  Aerotel negotiated a new

15   agreement which was more favorable to IDT.

16           The restatement, when it talks about the doctrine of

17   restitution or rescission, observes restatements of unfair

18   competition and unjust enrichment.  In its commentary, states

19   that where somebody's in IDT's position and they've gotten a

20   better deal under the agreement -- under our new agreement than

21   under a prior obligation, it's in their interest to perform --

22           THE COURT:  Well that may be.

23           But what I'm struggling with is the idea that -- the

24   2009 agreement, I assume, reflects one of several things when

25   it comes up with a lower figure of Aerotel's entitlement.  One

D7i9aera

```
 1    is that some benefit has already been conferred to Aerotel in

 2    between that is being reflected here, number one; or number

 3    two, the 2007 agreement has implied terms that go beyond the 30

 4    million on its face such that the parties are treating it as,

 5    in fact, a lower number in 2009, or there's some other

 6    consideration here.  But the reversion to 2007 with a much

 7    higher amount seems to me -- it's nice work if you can get it,

 8    but it's not obvious to me why restitution means that.

 9             MR. OSTRAGER:  Well restitution means the benefit

10    conferred to.  Every value the arbitration panel would place

11    upon the release of the 2007 obligation.  In the arbitration,

12    Aerotel established what the meaning was of the 2007 agreement.

13    And the arbitrators commented upon that in their decision.  It

14    would be advantageous for IDT to perform under the --

15             THE COURT:  Was there any performance that occurred

16    under the 2007 agreement?

17             MR. OSTRAGER:  No.  None.  There was no performance

18    under the 2007 agreement.

19             THE COURT:  Was there an allegation by IDT that

20    Aerotel had done anything to breach?  Just allegation is my

21    question to you.

22             MR. OSTRAGER:  No.  IDT's position in 2009, under the

23    2009 agreement and under the arbitration award was that simply

24    that Aerotel had breached -- the 2007 agreement was not

25    relevant to the proceeding.
```

D7i9aera

1          And in the arbitration, prior to the hearing, IDT

2    filed a motion to exclude evidence relating to restitution.

3          During the arbitration hearing, IDT filed a motion to

4    exclude Aerotel's expert testimony on the restitution remedy.

5          And in the posthearing briefs the parties addressed

6    the availability of a restitution remedy.

7          The simple answer is, is that the reason why

8    restitution is more valuable to Aerotel today than performance

9    under the 2009 agreement is simply that the arbitration panel

10   found, with respect to the domestic component of the agreement,

11   that Aerotel, as a new business, didn't have a sufficient track

12   record to establish lost profits.  So restitution becomes

13   particularly appropriate where a party is unable to establish a

14   legal remedy of lost profits and so alternatively takes the

15   lesser amount represented by the benefit conferred or in this

16   case the release of obligations under the 2007 agreement.

17         Under the 2009 agreement, Aerotel would be far better

18   off if IDT had performed and allowed it to realize profit.

19   With the performance under the -- with the restitution remedy,

20   looking back to the 2007 release, Aerotel's receiving a lesser

21   number.  But the answer is simply that if IDT abrogates --

22   materially breaches its obligations, does not perform and

23   permit Aerotel to monetize profit and if you have the -- and as

24   part of, we would view as bad faith conduct, doesn't permit

25   Aerotel to realize that benefit, it has no alternative but to

D7i9aera

1    say I want at least the greater of what I gave you, as

2    consideration for this agreement, or alternatively the lost

3    profit --

4              THE COURT:  I guess to beat a dead horse a little bit

5    one more time, the difficulty I'm having is the notion that

6    restitution takes us back to 2007 at the time of that agreement

7    and not 2009 at the time of the dispute that arose that gave

8    rise to the 2009 settlement agreement.

9              In other words, there are other facts there.  One

10   might argue that the remedy for restitution is to take you back

11   to the point before the 2009 agreement was settled and said,

12   fine, go litigate where you were at in 2007.  Because there may

13   be intervening facts.

14             What's bothering to me about Aerotel's position is

15   that it appears to cherrypick the 2007 agreement and whitewash

16   the rest of history out.

17             MR. OSTRAGER:  Your Honor, I agree with you that as an

18   affirmative defense IDT can certainly argue that -- Aerotel's

19   position is that the termination cost is a raw commodity and

20   there's an exhaustive record concerning the valuation of that

21   commodity.  And the arbitrators failed to make fact findings on

22   that value.

23             Now, IDT certainly asserted and has the right to

24   assert that that value is actually less than you assert.  It's

25   not a raw commodity, plus the associated value of the SG&A, you

D7i9aera

know, Aerotel would still have to prove that it actually

could -- there was a real market for that, for the commodity as

defined in the '07 agreement.

The point I'm making is that all of the findings by

the arbitration panel concerning the marketability of domestic

cards by Aerotel have to be viewed through the lens of the

restrictions in the 2009 agreement concerning pricing, markets,

and -- which all were designed to, in the arbitration panel's

view, to restrict Aerotel's markets for selling domestic cards.

What we're urging the Court to accept is that if you

go back and you look at the value of the release as of the time

the '09 agreement was entered into, Aerotel takes the position

with its expert reports and its testimony concerning the value

of that commodity in 2009 when that agreement was executed,

based upon the terms of the 2007 agreement, IDT has the

absolute right, and there's an exhaustive record concerning

these issues, to say it's really worth something less.  But

whatever that value is, that restitution is a legal remedy

which a nonbreaching party has the absolute right to elect.

It's black letter law.  Typically when you have an agreement,

the nonbreaching party elects lost profits because that

generally is a higher amount.

THE COURT:  Did the other side agree that the measure

of restitution, if restitution were available, was -- I guess

what -- you're seeking 8 million domestic and 12 million

D7i9aera

1    international?

2            MR. OSTRAGER:  Right.

3            THE COURT:  How does that sync up with the 2007

4    agreement which was 15 million cash, 15 million in kind?

5            MR. OSTRAGER:  Aerotel's expert does an analysis of

6    the value of the telecommunication service and the associated

7    SG&A and factors in interest.  And those are the numbers that

8    you come up with.

9            Now, the arbitration panel recognized in the decision

10   that that would be the measure, and that IDT could properly

11   assert that it was worth less.  Taking into account the terms

12   of the 2007 agreement, the arbitration panel simply said there

13   were issues concerning whether Aerotel's computation is

14   correct.  But they don't reach the issue because they

15   determined that restitution is not an available remedy.

16           So we are not here arguing that as a matter of law

17   Aerotel is entitled to $20 million as a restitution remedy.

18   Our position is that the termination of that damage measure has

19   to be made based upon an exhaustive record before the

20   arbitration panel.

21           THE COURT:  Therefore, if you were to prevail what

22   would happen here?

23           MR. OSTRAGER:  We would ask the Court to do one of two

24   things.  The Court could vacate the award as reflecting a

25   manifest disregard of the law or in addition or alternatively

D7i9aera

in violation of Federal Arbitration Act Section 10(a)(4) and

send it back to --

           THE COURT:  To a new panel.

           MR. OSTRAGER:  To the panel for further fact findings.

Or under the F.A.A. this Court could review that record and

make its own determination.

           We're not saying that from the four corners of these

papers that one can set that valuation.

           What we are saying is that it's black letter law.  If

you look at the ESPN case, which the panel cites to, and Judge

Scheindlin --

           THE COURT:  Suppose the panel got it wrong legally,

more is needed, right?

           MR. OSTRAGER:  Absolutely.

           THE COURT:  You look at this decision, I have to say,

having now had occasion to read more than a few of them, this

is actually an unusually thoughtful, arbitral decision which

recites legal propositions and may or may not apply them right.

I'm not opining for now.  But I'm having difficulty with the

willful disregard -- willful disregard is often in the context

of well we know we're not supposed to award punitives but this

is really bad so we're going to award unauthorized punitives.

           Tell me why there is manifest disregard of the law

here.

           MR. OSTRAGER:  I think it's illustrated in our

D7i9aera

1    demonstratives.

2              THE COURT:  Go ahead.

3              MR. OSTRAGER:  If you look at the panel's rejection of

4    the restitution claim, the language speaks for itself, four

5    corners of the document.

6              In this first demonstrative, the panel acknowledges

7    that it's appraised of the governing and clearly applicable law

8    and, quote, the panel states "The case law reflects that while

9    restitution is generally available as an alternative remedy for

10   breach of contract, and they're referring to a legal remedy, it

11   becomes available either following repudiation or on a breach

12   by nonperformance that gives rise to a claim for damage for a

13   total breach."  That's the law.

14             You turn to the second slide, the second

15   demonstrative, the panel then explains why they're not going to

16   award restitution.  They say, "When claimant's case is stripped

17   of the hyperbole, however, the evidence reflects that IDT's

18   breaches did not effectively deny Aerotel all or substantially

19   all of the benefits of the 2009 agreement.  Nor did IDT's

20   actions constitute anything resembling a repudiation.  In sum,

21   while IDT's efforts were deficient in the respects discussed

22   above, these deficiencies do not lead to the conclusion that

23   IDT effectively repudiated and/or denied to Aerotel

24   substantially all the benefits of the bargain."

25             There is no authority for that proposition.  The black

D7i9aera

1    letter law is that when there is a material breach of an

2    agreement, that the nonbreaching party has an election.  They

3    can elect to continue performance and in effect waive the

4    materiality.  And ESPN discusses this.  Or they can, based on

5    the material breach, they can terminate the agreement and seek

6    remedies for total breach.  And ESPN explicitly states that the

7    fact that a nonbreaching party has waived a prior material

8    breach, in no respect prevents the nonbreaching party from

9    then, at a later material breach, terminating --

10             THE COURT:  Right.  I didn't understand the panel to

11    be saying, to rule against you on the grounds of election.  I

12    understood the panel --

13             MR. OSTRAGER:  That's correct.

14             THE COURT:  One moment.

15             I understood the panel to be saying in the vernacular

16    yes, there's a breach but it's not a complete repudiation.

17    It's not a total breach.  There are enough breaches here that

18    they rise to the level of materiality, but there was a lot of

19    performance as well.  And we conclude that the appropriate

20    remedy under the circumstances is something that I would have

21    called expectation damages or lost profits.

22             That's the read I get of what the panel is saying.

23    Why is that a -- you may disagree with it.  It might even be

24    wrong.  But why is it a manifest disregard of the law?

25             MR. OSTRAGER:  I'll tell you why it is that.

D7i9aera

1              A material breach and total breach are synonomous in

2      the law.  The panel determined that the agreement was

3      terminated by Aerotel based upon a material breach in

4      February 2012 and that from February 2012 until the hearing and

5      the decision there was a winding down of the business

6      enterprise.

7              So under the panel's very, very scholarly five-page or

8      six-page discussion of the election of remedies and its

9      discussion of the available legal remedies, the panel

10     determined that the contract was terminated, properly

11     terminated by Aerotel for material breach, and that the

12     agreement which has a term extending out to 2017, October 1,

13     2017, is terminated for material breach and Aerotel is entitled

14     to damages for the entirety of the agreement.

15             So the statement on the second demonstrative

16     contradicts by its plain language the language of its statement

17     of the law.

18             And we would submit that this is akin to the Second

19     Circuit decision in Hardy where the circuit stated that where

20     there's an internal contradiction which cannot be explained,

21     that it -- that that establishes that the panel flouted the

22     law.  Because they were well appraised of the law.  It was the

23     subject of endless motions to strike the restitution remedy.

24     And so Hardy specifically states at 341 F.3d 129 to 131.  In

25     that case they reversed the district court order confirming an

D7i9aera

1    arbitration award as simply untenable because the arbitral

2    panel disregarded the same legal principle it purported to

3    apply.

4           So this comes down to the point that if there's a

5    material breach sufficient to terminate the agreement, then

6    Aerotel is entitled to damages for total breach.  And it has

7    legal remedies.  And the legal remedies available to Aerotel

8    are either lost profits or restitution.

9           And so our point is that there's an internal

10   contradiction here.  And in terms of the panel being appraised

11   of the law.  There is just exhaustive motion practice and

12   briefing on the proper measure of damages for total breach.

13   And that's what's happened here and that's why there is --

14   that's why they -- that's why the arbitration award cannot be

15   sustained.

16          And this is really akin to the Westerbrook standard

17   which talks about permitting -- that the Court should vacate an

18   arbitration award where the denial of a remedy, as in this

19   case, strains credulity.

20          It's Hornbook law that when there's a material breach,

21   which the panel found, definitely found was sufficient to

22   terminate the agreement and give Aerotel remedies for full

23   performance throughout the entirety of the agreement.

24          Now if there is no material breach sufficient to

25   terminate the agreement, then the agreement continues.  And

D7i9aera

1     Aerotel is then entitled to draw the $5 million in domestic

2     termination costs and monetize it.

3            What the panel did was it -- Aerotel asked to

4     terminate the agreement for material breach.  It said your wish

5     is granted.  The agreement is terminated.  We're going to give

6     you a remedy for total breach.  But unfortunately you haven't

7     established -- because you're a new business and because we

8     acknowledge there's a material breach with respect to the

9     domestic and the international, and specifically with respect

10    to domestic IDT didn't give you the product to market and the

11    channels to trade that you wanted to market it, and so you

12    don't have a track record, you're a new business, there's a

13    stringent measure -- a stringent evidentiary requirement for

14    establishing lost profits.  You're not entitled to a lost

15    profit remedy.  It's unfortunately -- unfortunately the result.

16           We would submit that that's -- it turns reason on its

17    head.  You can't terminate the agreement and forfeit rights

18    that extend out to 2017 and on the one hand say these are the

19    legal remedies but we've decided without any precedent to

20    afford them to you.

21           Now I agree with the Court that if you look at the

22    second slide, that the panel is stating -- the panel is, in

23    fact, stating we don't think that the material breaches really

24    amount to all that much or you've got some performance so what

25    are you complaining about.  But they can't reconcile that with

D7i9aera

1    the governing law.  If this is the case, then they can't

2    terminate the agreement.

3                THE COURT:  Okay.  Thank you.

4                Let me see if I have a question or two for you more.

5                MR. OSTRAGER:  Your Honor --

6                THE COURT:  Okay.  I'm sorry.  Just tell me the

7    history of the arbitration clause.  Who chose arbitration here?

8                MR. OSTRAGER:  Well the parties negotiated the

9    agreement.

10                THE COURT:  Who drafted the agreement?

11                MR. OSTRAGER:  We provided -- Aerotel provided a

12    draft.  It went back and forth over an extended period of time

13    with both parties participating in it.  I honestly don't

14    recall -- I may have put it in.  I don't recall precisely.  I

15    think I did actually.

16                THE COURT:  Let me hear then now from the respondent.

17                MR. OSTRAGER:  Your Honor, could I very briefly?

18                THE COURT:  No.  You're way longer than I -- I gave

19    you a lot of time.  Thank you.

20                MR. OSTRAGER:  Thank you, your Honor.

21                THE COURT:  That is Mr. Laffey.

22                MR. LAFFEY:  It is, your Honor.

23                THE COURT:  Let me just begin with the redaction

24    point.

25                MR. LAFFEY:  Great.  Thank you, your Honor.  The

D7i9aera

1    reason for the redactions is in the 2009 agreement there's a

2    confidentiality provision.  The parties agreed to a very broad

3    protective order in the arbitration.  The arbitration didn't

4    just deal with correspondence between my client and Aerotel.

5    It put at issue all of IDT's business practices, its

6    relationship with its distributors, its relationship with its

7    termination carriers, really the pricing on each of its cards

8    including it's popular brand.

9            THE COURT:  Where do we stand now?  I have an interest

10   in making sure that the public has some ability to understand

11   what's happened here.  Putting aside attachments to your

12   briefs, is there any reason why any part of your briefs need to

13   be redacted on either side?  It seems quite historical.  It

14   seems largely focused on the dispute between you.  I, off the

15   top of my head, I didn't see any that seemed to be giving away

16   the store as to any business practices or confidentiality.

17           MR. LAFFEY:  If the exhibits are excluded and under

18   seal, I would have no objection to the briefs, your Honor.  If

19   you would like, we could relook at the redactions to see if we

20   can limit them in any way.  I'm happy to do that.

21           THE COURT:  Mr. Ostrager, same for you.  Do you have

22   any objection to the briefs being submitted in unredacted form?

23           MR. OSTRAGER:  We have no objection to any document

24   being submitted in unredacted form.

25           THE COURT:  Very good.  Then counsel, independent of

D7i9aera

whatever happens here, I will ask that counsel unredact the
briefs since that doesn't seem to be objectionable.

          I'm not going to go so far as to direct that you
review exhibit by exhibit the exhibits to see whether each
needs to be redacted.

          Same, I think, for the arbitral award, the
arbitrators' decisions themselves.  Mr. Laffey, any objection
to those being -- again, that's the central document that's
under review.  Do you have any objection to the arbitral awards
being added to the briefs as materials to be unredacted?

          MR. LAFFEY:  I have to take a look back through the
award because there were some fact findings about the
testimony.  I could say with certainty the briefs we can
unredact, but I would have to go through the award.

          THE COURT:  Why don't I ask each of you after this,
regardless of any outcome, I want you to meet and confer about
whether there's any reason whether the arbitral awards can't
also be unredacted.

          Again, I'm not trying to flout your confidentiality
agreement.  There's a balance here.  But it seems to me it's
likely that the balance is fairly drawn on the one hand with
the briefs and the decisions below being open for public view
and on the other hand the raw material not.

          MR. LAFFEY:  We understand your position, your Honor.
We're happy to do that.

D7i9aera

1          THE COURT:  Mr. Laffey, go ahead.

2          MR. LAFFEY:  I'd like to start, your Honor, with

3     something that Mr. Ostrager neither in his argument or in any

4     of his briefs has mentioned that is the element of causation.

5     Aerotel had the burden of establishing all the elements of its

6     breach of contract claim.  One of them, the necessary elements,

7     is the element of causation, which leads me to talk about the

8     domestic card issue and the findings by the panel.

9          The panel held that while they did find one particular

10    breach related to domestic cards, they found that in other

11    areas IDT did not breach on domestic cards.  But with respect

12    to that issue the panel found that it was not IDT's breach that

13    resulted in Aerotel being unsuccessful in the selling of

14    domestic cards.  Quite to the contrary, the panel found, based

15    on the testimony -- and there were fifteen witnesses that

16    testified -- that, in fact, it was Aerotel's own inexperience

17    in the domestic prepaid calling card business.  The panel made

18    specific findings, including that Aerotel never hired any sales

19    people, never made any investment --

20         THE COURT:  Sorry.  Slow down for a moment.

21         MR. LAFFEY:  Sure.

22         THE COURT:  They never hired domestic sales people.

23         MR. LAFFEY:  Never hired any domestic sales people.

24    It made no other infrastructure investment in domestic cards.

25    The panel also found that IDT had delivered PINs worth a face

D7i9aera

1    value of $20 million.

2              THE COURT:  Of what?

3              MR. LAFFEY:  Worth $20 million to Aerotel.

4              THE COURT:  Domestic or international?

5              MR. LAFFEY:  Domestic.

6              THE COURT:  They delivered $20 million of domestic

7    cards?

8              MR. LAFFEY:  $20 million of domestic PINs.

9              THE COURT:  What's a PIN?

10             MR. LAFFEY:  A PIN is something you can sell online

11   that a consumer can use to access IDT's termination minutes.

12   So rather than buying a physical card in the store you can buy

13   a PIN online and can use it the same way.

14             THE COURT:  Is the currency the same though?  Is it

15   dollar for dollar the same?

16             MR. LAFFEY:  It is.  It's the same thing.  It would

17   function just like a domestic card would if you bought it in

18   the store.

19             THE COURT:  The $20 million equates to what?  Why were

20   you giving -- why was IDT giving Aerotel $20 million in

21   domestic PINs?

22             MR. LAFFEY:  Well they delivered the 20 million in

23   domestic PINs.  Aerotel would go out there and attempt to sell

24   the PINs.  Obviously, if they sold five million then they

25   wouldn't be entitled to sell anymore PINs.  They were entitled

D7i9aera

1     to five million under the contract.

2              But IDT did, in fact, and this was held -- it's on

3     page 21 of the interim award.  The panel held that IDT did, in

4     fact, make $20 in face value of PINs available to Aerotel.

5              THE COURT:  I'm just trying to understand why IDT

6     seems to have gone beyond the face amount that it was obliged

7     to under the 2009 agreement.

8              MR. LAFFEY:  It delivered the PINs -- it established

9     the face value of the PINs.  Consumers may or may not buy them.

10    So it wouldn't be necessarily that 20 million in termination

11    costs would ultimately be used.  There was a lot of back and

12    forth and disputes by the parties about domestic cards.  So IDT

13    did that as a way to resolve the issue and to give Aerotel a

14    mechanism to sell domestic cards.  The panel found that Aerotel

15    never did a single effort to sell those domestic PINs.

16             The panel also held that Aerotel spent most of its --

17             THE COURT:  What is the significance of Aerotel's --

18    if the facts are that IDT performed in significant ways, as you

19    say, and that Aerotel sat on its duff and did nothing, but that

20    IDT then breached in some other way, what's the significance of

21    Aerotel's inaction?

22             MR. LAFFEY:  The significance is that even if IDT had

23    done the things that the panel thought IDT should have done

24    with respect to domestic cards, the panel concluded, based on

25    the testimony, that at the end of the day Aerotel still would

D7i9aera

have sold nothing because they did nothing to invest and to put

in the type of investment and money and employees that were

needed to succeed in a domestic card business.

        THE COURT:  So that explains why if one seeks out as

the measure of damages lost profits one can calculate zero.

        MR. LAFFEY:  Correct, your Honor.

        THE COURT:  Or imponderable.  But it doesn't explain

the unavailability of restitution.

        In other words, if there's been a material breach, why

isn't Mr. Ostrager right that the right remedy would be to

revert to a restitutionary measure.

        MR. LAFFEY:  Well on domestic cards I don't think you

ever get there because the element of causation is not met.  I

don't agree that you get restitution if you don't show

causation.  Causation is an element you have to prove before

you get to a remedy.

        THE COURT:  Causation of what?

        MR. LAFFEY:  Causation in showing that the specific

breach you're alleging has caused some form of damage.

        Aerotel had to show that before Aerotel proved a

breach of contract.

        THE COURT:  Can I ask you then silly question.  Where

are the cards -- where are these domestic PINs or cards today?

Does Aerotel retain them?

        MR. LAFFEY:  They were returned to IDT is my

D7i9aera

1    understanding.

2            THE COURT:  So the issue, I think, per Mr. Ostrager,

3    is that they sort of get it going and coming.  They can't get

4    the measure of damages that is lost profits because the breach

5    didn't -- because they didn't make any efforts under the

6    contract.  They can't get restitution, you say, because they

7    didn't -- it was their own inaction that prevented them from

8    converting.  But at the same time the cards that have at least

9    some potential in it have been taken away.

10            Your argument would seem to make more sense if Aerotel

11   was left holding on to the cards and then it's up to its own --

12   it's up to Aerotel to increase its own industry and energy

13   level to convert them into real money.

14            But why does this outcome make sense if Aerotel has

15   lost the cards?

16            MR. LAFFEY:  Well the PINs were returned by Aerotel.

17            All the cards that Aerotel had and that it had on the

18   street as of the time of the arbitration hearing were honored

19   by IDT.  Aerotel never asked for -- both before the

20   arbitration, during the arbitration, or after the

21   arbitration -- never asked for specific performance.

22            In fact, they said to the panel -- this is quoted on

23   page six of their posttrial brief:  Specific performance would

24   be an inappropriate remedy.  Instead, they told the panel we

25   want a cash payment.  We want it in the form of restitution.

D7i9aera

1              And restitution was not a remedy that was either

2      legally or factually available to Aerotel.  And there are a

3      number of reasons why.

4              THE COURT:  Tell me why.  Because his argument is

5      there's a big enough breach here for the panel to consider it a

6      material breach, and he's got case law that he says says that a

7      material breach translates into a breach that justifies an

8      election of restitution as opposed to lost profits.  Why is

9      that wrong?

10             MR. LAFFEY:  There's a number of reasons, your Honor.

11     First, if you look at the case law that Mr. Ostrager claims the

12     panel manifestly disregarded.  He mentions the ESPN decision,

13     and he mentions in his brief the Asia Global Crossing decision

14     from Judge Holwell.  That's really the key decision.  ESPN

15     doesn't deal with restitution, doesn't even mention

16     restitution.  Asia Global deals with restitution.  And it sets

17     forth what you have to show to get restitution.  And then it

18     discusses how restitution works.

19             So on how you get restitution they said you have to

20     show one of two things.  A repudiation, which the panel held

21     IDT had never repudiated the contract.  To the contrary, IDT

22     always took the position let's continue performance.  Let's

23     continue performance.  They found IDT never repudiated.

24             The second way you could have restitution is if there

25     is evidence of complete nonperformance on the part of the

D7i9aera

```
1    breaching party.  The panel held there is no evidence of

2    complete nonperformance.  To the contrary, Aerotel used over $2

3    million in international termination under the 2009 --

4              THE COURT:  That's international.  But I think the

5    panel's -- I think Mr. Ostrager is dividing the universe into

6    domestic and international and his argument is trained on the

7    domestic side.

8              Is it your position that for purposes of this analysis

9    one has to look holistically at the two together?

10             MR. LAFFEY:  My position is whether you look at them

11   together or you look at them separately, either way the panel

12   held that there was no complete nonperformance.

13             THE COURT:  So --

14             MR. LAFFEY:  On domestic --

15             THE COURT:  What was the performance on domestic?

16             MR. LAFFEY:  On domestic, as I mentioned, the paneled

17   held that IDT did make domestic products available to Aerotel.

18             THE COURT:  You mean the 20 million in PINs?

19             MR. LAFFEY:  The 20 million in PINs.  There were also

20   domestic cards that IDT made available to Aerotel.

21             But what the panel says is Aerotel, the reason you

22   didn't sell those products is because you didn't have domestic

23   sales people.  You didn't market the cards.  You didn't know

24   how domestic cards work.

25             It's worth talking a little bit about international
```

D7i9aera

versus domestic cards, your Honor.  International cards are the

most common and the most popular of prepaid calling cards IDT

sells.  And it's usually for someone who grew up in another

country, say Mexico, who now lives in, say the outer boroughs

like Queens, and they want to call overseas to Mexico.  They

buy an international prepaid calling card because it's a

cheaper way for them to call home than other phone methods.

Domestic cards are used to call domestic locations.

They're not as popular cards.  The only times that they're

really utilized or sold are in what we call big box retailers

such as Walgreens or Wal-Mart.  But to do that you have to have

certain technology which is called point-of-sale activation

technology.  Aerotel never bothered to buy point-of-sale

activation technology.  That was another finding at the

hearing.  Aerotel never did anything.  It wasn't a

nonperformance, complete nonperformance, which is what Asia

Global requires to have restitution.

Another important thing about the Asia Global decision

is it talks about what restitution is.  This is a quote from

the decision.  "Restitution aims to restore the nonbreaching

party to as good a position as the one she occupied before the

contract was made."  So what Asia Global is saying is you put

the party in the position they were in the day before the

contract was entered into.

THE COURT:  The 2009 contract.

D7i9aera

1          MR. LAFFEY:  The 2009 contract.

2          So this panel asks:  Where would Aerotel be the day

3    before the 2009 agreement was signed?  They wouldn't be

4    entitled to a cash payment, as Aerotel insisted in its

5    restitution demand.  At best, they had an alleged claim against

6    IDT for breach of the 2007 agreement.  But Aerotel never sought

7    specific performance, never asked to be put back in the place

8    where they had a claim under a prior agreement.  Aerotel said

9    give us a cash payment in the form of restitution.

10         THE COURT:  So let me ask you this.  Suppose Aerotel

11   had done the right things to preserve its ability to seek

12   restitution here.  Let's suppose that Aerotel had proven -- one

13   moment -- suppose that Aerotel had proven a complete

14   repudiation by you.  What would the measurement of restitution

15   have been?

16         MR. LAFFEY:  If Aerotel had showed a complete

17   repudiation and they had properly asked for the remedy, I think

18   the only remedy they would be entitled to would be to put back

19   in place -- there was a release under the '09 agreement -- is

20   void it and they have a potential of asserting a claim under

21   the 2007 agreement.  They never asked for that.

22         THE COURT:  In effect we rewind the clock to some date

23   in 2009, the day before the 2009 agreement is struck and

24   Aerotel then can pursue its claims under the 2007 agreement?

25         MR. LAFFEY:  That would be right in a hypothetical

D7i9aera

1    scenario.

2             THE COURT:  I understand.

3             Now, Mr. Ostrager says and the measure of that in turn

4    is the dollar amounts, fifteen and fifteen, although I guess

5    you're -- under the 2007 agreement, and I was asking him

6    whether that's right or whether intervening facts also needed

7    to be taken into account.

8             How would you do that?  How would you conceive of

9    restitution the day before the 2009 agreement and what

10   relationship does it bear to the 2007 agreement?

11            MR. LAFFEY:  Well that's why it frankly doesn't work

12   here, your Honor, because there is no cash that's deferred

13   under either of those agreements.

14            In order for Aerotel to have monetized any of this,

15   they had to sell the cards.  It didn't entitled them to $15

16   million.  It gave them 5 million in domestic minutes, 10

17   million in international minutes.  That's not a cash product.

18            If you look at Asia Global, the scenario they're

19   talking about is the scenario where someone gives a downpayment

20   or an upfront cash payment and there's complete nonperformance.

21   So the perfect example, and they actually use this hypo in the

22   case, is when you buy a house.  If I come to you and say I want

23   to buy your house for $200,000.  You say yes, I agree but I

24   want a $50,000 downpayment.  And then we enter into that

25   agreement.  And then later you have a complete nonperformance

D7i9aera

1    or repudiation.  You say I'm not selling my house.  Restitution

2    gives me my $50,000 back, puts me in the position I was in on

3    day one.  If you are entitled to a cash payment that you had

4    put upfront.  It doesn't work here.  Restitution doesn't work

5    under these facts and that's what the panel held.

6              THE COURT:  Because it's not a cash item that is --

7              MR. LAFFEY:  That's correct.

8              THE COURT:  What about Mr. Ostrager's point that

9    though there's an easy monetize-able value of the cards, that

10   it might well be that the cards would be worth more than the

11   stated face value of $15 million or whatnot, but that they're

12   certainly not worth less, and certainly $15 million out of

13   IDT's pocket, why isn't that at a floor the valid basis for a

14   restitution award?

15             MR. LAFFEY:  Well, first, what they were given in the

16   agreement is not a bucket of $15 million in cards.  It's $15

17   million in termination costs, which is minutes from a carrier.

18   And we disputed that that's an easily marketable product or

19   like cash at the hearing.  In fact, our expert took the stand

20   and said that was not the case.  And they never cross-examined

21   our expert.  And the panel was relying on our expert's

22   testimony, something that your Honor can't second guess when

23   reviewing an arbitration award.

24             THE COURT:  And the expert says what about the

25   termination cards?  The termination minutes?

D7i9aera

1          MR. LAFFEY:  That termination costs or termination

2    minutes is not something like cash.  It's not something you can

3    just place a phonecall or go down the street and you can just

4    sell 15 million worth of termination minutes for $15 million.

5    It's not the equivalent of cash.

6          THE COURT:  Just because it's not easily marketable in

7    the United States?

8          MR. LAFFEY:  Correct.

9          THE COURT:  I mean I feel like I have seen in, like

10   you say, big box retailers cards that would allow a kid at

11   school or summer camp to buy $25, $50.  That doesn't seem like

12   an uncommon product.  Why is it that that's not fairly

13   liquidatable?

14         MR. LAFFEY:  Well, the big box retailers and the

15   domestic cards we talked about, my understanding is that in

16   order for you to get an account with a store like that where

17   you can sell your cards, the retailer requires you to buy and

18   place in their store certain technology which is called POS

19   activation technology.  It's expensive technology.  You

20   essentially have to invest in a relationship with a Walgreens.

21         That costs a lot of money upfront to start that

22   business.  That's the type of thing Aerotel had no interest in

23   doing.

24         So that's why it's not as easy as going down the

25   street to Walgreens and saying I have 15 million in termination

D7i9aera

1    which is not a sellable commodity like cash is.

2            That's something the panel relied on in finding that

3    restitution was not an appropriate remedy.

4            THE COURT:  Can you help me here.  Stepping back from

5    the panel's reasoning for a moment.  Give me a few sentences

6    why this as to the domestic side is a rational outcome.

7            In other words, there are substantial things of value

8    that sequentially Aerotel appears to be entitled to on the

9    domestic side of the house.  They get breached on.  It's true

10   they may have not gotten out of the starting gate in trying to

11   market it.  But at the same time they got breached upon.

12           It feels arguably hard to explain, if you had to

13   explain to somebody in lay terms why they wind up with nothing

14   when they are the victim of a breach and all they have done is

15   to get out of the gate slowly in marketing.  Help me with that.

16           MR. LAFFEY:  Sure.  I would start by what I've said

17   before, which is causation was an element they had to prove.

18   They failed to prove causation.  Your Honor can't second guess

19   the panel's determination based on the testimony.  They didn't

20   prove one of their elements.

21           THE COURT:  But here's the challenge for you.  In

22   other words, if what you mean by failed to prove causation is

23   that they failed to prove that the breach contributed to any

24   loss because they, Aerotel, were incompetent, inactive, not

25   doing anything to convert this asset into money.  I get that.

D7i9aera

1    It doesn't work as well once they've lost the asset, right?

2            In other words, presumably -- when were the cards due

3    to expire?

4            MR. LAFFEY:  Well the agreement would last up to 2017.

5            THE COURT:  So maybe Aerotel was just sort of a late

6    bloomer and was going to get out of the gate in finding a way

7    to make use of this asset sometime later in the rather long

8    contractual period.

9            MR. LAFFEY:  There are a few reasons that I wouldn't

10   say it's an unjust result.  First of all, when questioned on

11   the stand, Mr. Nhaissi, who was the chairman of Aerotel,

12   admitted that when he entered into this agreement he was taking

13   a risk on Aerotel's ability to be successful in this business.

14   So he knew he may get zero.  He knew he may get something more.

15   And he knew he was taking a risk.

16           So there was never an expectation that Aerotel would

17   be handed $5 million.  There was no expectation Aerotel would

18   be given a cent.

19           THE COURT:  If the breach takes place close to the end

20   of the contract period such that it's hard to imagine any

21   scenario over where Aerotel could have converted the PINs into

22   real money, I get it.  But where there was five years left on

23   the clock.  Explain to me why this is a rational outcome.

24           MR. LAFFEY:  It's a rational outcome because I don't

25   think that there was ever any proof that Aerotel ever would

D7i9aera

have been successful in selling domestic cards.  And I don't

think any of the testimony suggested that Aerotel ever had any

intent to invest in the types of things it needed in domestic

cards.

          The reality is the agreement was in place for twelve

months.  And at that point, rather than continue to try to sell

cards, Aerotel filed suit.  They were trying to short circuit

this entire agreement through litigation.  They could have

continued to try to sell cards.  They could have hired domestic

people.  They could have spent the money on the domestic

infrastructure.  They never did.  So they can't cry foul that

it's IDT's that they never consulted --

          THE COURT:  How much of the problem here is Aerotel's

decision not to seek specific performance?

          MR. LAFFEY:  Well that's certainly a remedy they could

have asked for.  But they repeatedly told the panel we don't

want it.  We're not going to ask for it.  That's not the remedy

we want.

          THE COURT:  So your point is there are three possible

remedies out there.  Specific performance is not sought by

Aerotel.

          Restitution is unavailable because -- one moment I

want to make sure I've got this right -- because there's

neither repudiation or complete nonperformance.

          And lost profits is unavailable because Aerotel had

D7i9aera

1    not gotten out of the gate in terms of actually putting itself

2    in a position to market these things.

3              Fair summary?

4              MR. LAFFEY:  That's a fair summary.

5              Plus the other reason that I said, that restitution

6    doesn't work here because what restitution does is put you in

7    the place you were day before a contract was entered if you

8    were entitled to a cash payment, which I walked through that

9    earlier.  And that's not a situation.

10             THE COURT:  I understand that is a separate point.

11             Help me with the causation again.  Is causation any

12   different than the failure to have in place mechanisms to turn

13   the cards into money?

14             MR. LAFFEY:  No.  That was -- that's all tied to the

15   causation point.

16             What the panel held was it wasn't the breach by IDT of

17   the domestic card provisions that resulted in Aerotel selling

18   zero dollars in domestic minutes.  It was Aerotel's own

19   inability to invest in the business, refuse to hire a sales

20   force, and all those steps.  Those were intervening causes that

21   resulted in zero dollars going to Aerotel in the domestic

22   card --

23             THE COURT:  A few more questions.  What's the history

24   of the arbitration agreement?  Whose idea was it?

25             MR. LAFFEY:  My understanding was that IDT insisted on

D7i9aera

1    the arbitration agreement.  Aerotel has been suing IDT going

2    back to 2003 in federal court.

3            We certainly wanted to be in arbitration.  I

4    personally wasn't involved then.  I believe IDT insisted on it.

5    But I don't know that Aerotel had an objection to it.  And

6    ultimately the parties agreed on arbitration.

7            THE COURT:  There is much said in the briefs about the

8    difference, if any, between a material breach and a total

9    breach.  Does IDT have a view on that?

10           MR. LAFFEY:  Yes.  The cases -- this all goes back to

11    the burden.  I know your Honor is well aware of the standard.

12           THE COURT:  I know the standard.

13           MR. LAFFEY:  But it's their burden to show not that

14    there was an error of law, not that the law was misapplied.

15    It's their burden to show the panel intentionally disregarded

16    the law.

17           So they are saying the panel intentionally disregarded

18    the ESPN and Asia Global decisions.  The ESPN decision doesn't

19    mention restitution.  The Asian Global decision says you need a

20    repudiation and a complete nonperformance, which they say is a

21    total breach; not a material breach, a total breach.  And

22    that's important because if you take the time to read through

23    the well thought-out arbitration award, you'll see there are

24    eleven findings in favor of IDT, including that Aerotel

25    breached the 2009 agreement itself, that --

D7i9aera

1              THE COURT:  How did Aerotel breach the 2009 agreement?

2              MR. LAFFEY:  Because Aerotel was out there selling

3      cards and marketing them as the equivalent of IDT cards.  For

4      example, distributor going out in the marketplace and saying

5      this Aerotel card is the equivalent of the IDT BOSS card.

6      There was a provision that prevented them from doing that

7      because it hurt IDT's brand.  That was a provision in the

8      contract the parties agreed to.  The panel didn't award IDT

9      damages but they found that Aerotel breached the agreement on

10     that issue.

11             The panel held that IDT did not act in bad faith in

12     any respect in the agreement.  To the contrary, the panel said

13     the parties just had differences of opinion on the

14     interpretation of the agreement.

15             And there were numerous other provisions that the

16     panel held that IDT did not breach.  It found IDT acted

17     consistently in insisting that its logo go on fee cards.  It

18     said that the panel acted -- IDT acted consistently in setting

19     its termination and numerous other issues.

20             So we can't possibly say on this record that the panel

21     found a complete total breach.  It's just not reality.

22             THE COURT:  Do you -- Aerotel asks that if I don't

23     vacate the award that I confirm it.  What is IDT's view on that

24     relief?

25             MR. LAFFEY:  We would like the award as it exists to

D7i9aera

1    be confirmed, your Honor.

2                THE COURT:  Thank you.  It is 4:10.

3                I'm going to be back at about 4:40 with a decision in

4    this case.

5                MR. OSTRAGER:  Your Honor, can I have a few moments?

6                THE COURT:  You had a very, very long argument, longer

7    than your adversary's.

8                Thank you.  We stand adjourned.

9                (Recess)

10               THE COURT:  Good afternoon, counsel.

11               I have a decision to read in this matter.

12               Before the Court today is a motion by petitioner

13   Aerotel LTD, which I will refer to as Aerotel, to vacate the

14   interim and final awards previously entered by an arbitration

15   panel of the International Institute for Conflict Prevention

16   and Resolution, which I'm going to refer to as the panel,

17   pursuant to Section 10 of the federal arbitration act or

18   F.A.A., 9 U.S.C. Section 10, or alternatively to confirm that

19   award.  Respondent IDT Corporation opposes Aerotel's motion to

20   vacate the arbitral award.  The parties have briefed the motion

21   extensively, and the Court benefited from the parties'

22   thoughtful and detailed briefing.  The Court heard argument

23   today, very effective argument I might add on both sides, and

24   is prepared to rule on this motion from the bench now.  For

25   counsel's planning purposes, I do not intend to issue a

D7i9aera

separate written opinion on Aerotel's motion.  Instead, the

court intends to issue an order that incorporates by reference

the reasoning given from the bench.  Therefore, to the extent

that counsel wish to consult the transcript of my remarks, for

a specific articulation of the reasoning, you will need to

order the transcript.

First, some brief factual background.  Aerotel is an

Israeli corporation that specializes in medical instruments and

telecommunications technology.  See Aerotel's petition for

judgment vacating the arbitration awards, referred to herein as

petition Section 2.  IDT is telecommunication provider and a

distributor of prepaid calling cards, incorporated under the

laws of Delaware, and with its principal place of business in

Newark, New Jersey, quoting the petition at paragraph three.

The instant motion centers on a settlement agreement, which I

will refer to as the settlement agreement or the contract, and

it's reproduced at Laffey Declaration, Exhibit 10, which the

parties entered into on June 26, 2009 to resolve an earlier set

of disputes.  I'm citing here paragraph 8 of the petition,

Aerotel's brief at page 5, and IDT's brief at page 4.  Those

disputes had arisen out of an agreement entered into by the

parties in 2007, which I will refer to as the 2007 agreement.

The 2007 agreement, in turn, was the parties' attempt to

resolve a 2003 patent claim by Aerotel against IDT.  I'm citing

here IDT's brief at 4, the interim award in the case at 4,

D7i9aera

which is reproduced at Flaherty declaration Exhibit 1, and the

settlement agreement at 1.

        The settlement agreement provided that Aerotel would

receive $15 million of prepaid calling cards from IDT.  Under

the agreement, the $15 million was to be measured by IDT's

"Actual cost for termination of telephone calls placed by

consumers using the cards sold by Aerotel under the

agreement... to third party carriers."  Citing the settlement

agreement at Sections 1.9 and 2.1.  Of the $15 million total,

$5 million worth was to be allocated to domestic calling cards

and $10 million was to be allocated to international cards.

Citing the agreement at Section 2.2.  Aerotel, therefore, had

the opportunity to market these cards, knowing that IDT was

contractually committed to picking up those expenses due to

third party carriers, up to the amounts indicated.  The

settlement agreement gave Aerotel the right to market the

prepaid cards for a term that extended through October 1, 2017,

citing Section 2.12, and to use IDT's corporate logo in its

marketing, citing Section 2.3.  The settlement agreement stated

that it was to be governed by and interpreted in accordance

with New York law.  Citing Section 11.  It included an

arbitration clause to resolve any disputes arising under it.

Citing Section 12.  It is undisputed that this arbitration

clause was binding and effective.

        In the arbitral proceedings that occurred in this

D7i9aera

case, Aerotel claimed that IDT breached several material

provisions of the contract.  These included:  (1) restricting

Aerotel's use of the IDT logo; (2) rate-setting that Aerotel

viewed as inappropriate under the contract; (3) geographically

restricting where Aerotel could market its cards; (4) limiting

the availability and sale of the domestic carts; and (5)

delays, discrepancies and accounting irregularities.  I'm

citing here the interim award, page 10, the amended statement

of claim before the ICPR at paragraphs 39 through 58 which

appears as Flaherty declaration Exhibit 7.  Aerotel argued that

IDT's breaches were material and that they made the contract

"substantially worthless" to Aerotel.  IDT disputed these

claims.  It argued that it had not breached any of the

contract's material terms.  I'm citing generally the amended

notice of defense and counterclaims, presented at Flaherty

declaration Exhibit 8.  According to IDT, Aerotel's failure to

monetize the benefit provided to it was due to its inexperience

in the industry and its failure to commit sufficient resources

to that endeavor, particularly as to domestic cards.

On December 7, 2012, after seven days of hearings, the

arbitral panel issued a 36-page interim award.  This award was

the first of its decisions resolving the dispute.  The panel

analyzed the various claims of breaches and found for Aerotel

as to some and for IDT as to others.  Specifically, the panel

found that IDT had not committed any material breaches,

D7i9aera

1    although one technical breach, as to the use of its logo by

2    Aerotel.  See interim award 14 to 15; that IDT had committed no

3    breach as to its imposition of geographic restrictions on

4    Aerotel's marketing of the cards, see interim award at 19; and

5    that IDT had committed no breach as to any alleged delays,

6    discrepancies, and/or accounting irregularities, see interim

7    award at 21.  In contrast, the panel found that IDT had engaged

8    in certain breaches of the settlement agreement.  Specifically,

9    the panel found that IDT had breached the agreement in certain

10   ways with respect to rate setting, applicable to international

11   and domestic phonecards, see interim award at 15 to 19; and as

12   to the sale of the domestic cards, by refusing to permit

13   Aerotel to sell domestic cards to outlets other than so-called

14   big box retailers or chain stores through POS activation, such

15   as, for example, bodegas.  See interim award 19 to 21.

16   According to the panel, IDT's breaches were material because

17   they went to the "root of the agreement between the parties."

18   See interim award at 22 to 23.  The panel further found that

19   Aerotel had properly terminated the contract upon IDT's failure

20   to perform.  The panel rejected IDT's claim that Aerotel had

21   "elected" to continue performance and thereby foreclosed its

22   opportunity to recover damages resulting from the breach and

23   termination.  Here I'm citing the interim award at 23 to 26,

24   which in turn cited the following cases:  Eli Lilly and Company

25   v. Emisphere Techs., Inc., 408 F.Supp. 2d 668, 694 (S.D. Ind.

D7i9aera

2006) applying New York law; ESPN, Inc. v. Office of Commercial

Baseball, 76 F.Supp. 2d 383, 387 (S.D.N.Y. 1999).

As to remedies, the panel held that Aerotel was not

entitled to restitution under New York law.  See interim award

at 28 to 30.  The panel explained that the record did not

demonstrate that IDT had effectively repudiated the contract

and/or that IDT, although in breach, had denied Aerotel all, or

substantially all, of the benefits of the contract.  Id. at 29.

The panel also stated that, even if restitution damages had

been applicable, it was "far from certain" that they would be

computed in the manner that Aerotel suggested.  Id.

The panel instead found that Aerotel was entitled to

"lost profits," but solely with respect to the international

cards.  Interim award at 31 to 32.  According to the panel,

evidence of actual lost profits by Aerotel in connection with

the domestic cards was too speculative because Aerotel had not

taken meaningful steps towards marketing the cards; the panel

therefore did not award Aerotel any damages as to the domestic

cards.  Id. at 33 to 34.  The panel stated that, with Aerotel

not having sold any domestic cards, any award of lost profits

would necessarily have to be computed "with regard to Aerotel's

presumed future attempts to monetize the domestic termination

available to it" but, given Aerotel's passivity in moving to

market the cards, the panel stated, any such computation would

be based "on speculation and guesswork."  Interim award 33 to

D7i9aera

1    34.

2              The panel also declined to order specific performance,

3    which would have compelled the parties to continue their

4    contract with respect to the domestic cards.  See interim award

5    34 to 35.  The panel explained this outcome on three grounds.

6    First, Aerotel had never suggested that any such order would be

7    appropriate -- instead, Aerotel was seeking money damages;

8    second, there was "No precedent for a piecemeal remedy of

9    damages for one breach and specific performance for the other"

10   and "the election of remedies doctrine at least implicitly

11   precludes such relief"; and third, a provision of the

12   settlement agreement suggested to the panel that compensatory

13   damages would be the "favored remedy for a breach."  See

14   interim award 34 to 35.  The panel expressed doubt that

15   specific performance was appropriate where the parties'

16   business relationship had more than once proven fractious.  Id.

17   The panel requested another round of briefing by the parties as

18   to the appropriate amount of damages.  See interim award 35.

19             On December 12, 2012, Aerotel filed a motion for

20   clarification regarding the interim award.  See Laffey

21   declaration Exhibit 3.  In that motion, Aerotel requested that

22   the panel clarify the interim award.  Although framed as a

23   motion to clarify, Aerotel asked the panel to modify its

24   outcome as to the domestic cards, and to "Permit Aerotel to

25   monetize the $5 million in domestic" cards or, alternatively,

D7i9aera

1    award restitution or a reasonable estimate of lost profit

2    damages with regard to those cards.  On January 22, 2013, the

3    panel denied that motion.  See Laffey declaration Exhibit 4.

4    The panel held that Aerotel's application, although ostensibly

5    seeking clarification, sought to revisit the merits of the

6    award.  However, the panel stated, the doctrine of functus

7    officio counseled against reopening and revisiting the merits

8    of its award.  On March 15, 2013 after another supplemental

9    round of briefing by the parties as to damage, the panel issued

10   a final award, reproduced at Laffey declaration Exhibit 2.

11   That award granted $5,391,529 to Aerotel in lost profits,

12   inclusive of interest through March 15, 2013, as to the

13   international cards.  For the reasons it had given in it's

14   interim award, the panel awarded no damages to Aerotel as to

15   the domestic cards.

16         In this lawsuit, Aerotel asks that the Court vacate

17   the panel's awards, both as to domestic and also to

18   international cards.  The petition was filed under seal on

19   April 8, 2013, upon the order of my colleague, the Honorable

20   Robert W. Sweet, see docket 3, and was later assigned to my

21   docket.  On April 29, 2013, the Court granted the parties

22   permission to file their opposition and reply papers under

23   seal, directing them to file redacted versions of the petition

24   and supporting memorandum and exhibits, the opposition papers,

25   and the reply papers publicly on ECF.  See docket 13.  The

D7i9aera

1   Court received IDT's opposition and accompanying exhibits on

2   May 15, 2013 and Aerotel's reply on June 5, 2013.  The Court

3   today heard argument.

4           Beginning with the legal standard.  Section 10 of the

5   F.A.A. sets out the circumstances under which a court may order

6   that an arbitration award be vacated.  Those circumstances are:

7   "(1) where the award was procured by corruption, fraud or undue

8   means; (2) where there was evident partiality or corruption in

9   the arbitrators; (3) where the arbitrators were guilty of

10  misconduct in refusing to postpone the hearing, upon sufficient

11  cause shown, or in refusing to hear evidence pertinent and

12  material to the controversy; or of any other misbehavior by

13  which the rights of any party had been prejudiced; or (4) where

14  the arbitrators exceeded their powers, or so imperfectly

15  executed them that a mutual, final and definite award upon the

16  subject matter submitted was not made."  Citing 9 U.S.C.

17  Section 10.  The Second Circuit has further held that, "In

18  addition to the statutory grounds set forth in the FAA, an

19  arbitral award may be vacated if manifest disregard of the law

20  is plainly evident from the arbitral record."  Duferco

21  International Steel Trading v. T. Klaveness Shipping A/S, 333

22  F.3d 383, at 388-89 (2d Cir. 2003); sees also Willemijn

23  Houdstermaatschappij BV v. Standard Microsystems Corp., 103

24  F.3d 9, at 12, (2d Cir. 1997).

25          As the Second Circuit has repeatedly emphasized,

D7i9aera

however, a Court's review of an arbitral award is "very
limited... in order to avoid undermining the twin goals of
arbitration, namely, settling disputes efficiently and avoiding
long and expensive litigation," Citing Willemijn, 103 F.3d at
12; see also T. Company Metals LLC v. Dempsey Pipe & Supply,
Inc., 592 F.3d 329, 339 (2d Cir. 2010); Folkways Music
Publishers v. Weiss, 989 F.2d 108 at 111, (2d Cir. 1993);
Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales
Corp., 274 F.2d 805 at 808 (2d Cir. 1960).  As the Second
Circuit has put the point, "an arbitration award should be
enforced... if there is a barely colorable justification for
the outcome reached."  Landy Michael Reality Corp., v. Local
32B-32J, Service Employees International Union AFL-CIO, 954
F.2d 794 at 797 (2d Cir. 1992) citation omitted.

        The "manifest disregard" standard is the one relevant
here.  As to that standard, the Second Circuit has stated,
"Review under the doctrine of manifest disregard is severely
limited." Duferco, 333 F.3d at 389.  Citation omitted.  The
Second Circuit has instructed that such review is to be "Highly
deferential to the arbitral award"; thus, "Obtaining judicial
relief for arbitrators' manifest disregard of the law is rare."
Id.  The Second Circuit has stated that manifest disregard,
"Requires something beyond and different from a mere error in
the law or failure on the part of the arbitrators to understand
or apply the law" and occurs where "the arbitrator understood

D7i9aera

and correctly stated the law but proceeded to ignore it".

Willemijn, 103 F.3d at 12.  Citing Siegel v. Titan Industries

Corp., 779 F.2d 891, at 892 (2d Cir. 1985) per curiam.

The Second Circuit has recognized "three components to

its application of the manifest disregard standard:  (1)

whether the law that was allegedly ignored was clear, and, in

fact, explicitly applicable to the matter before the

arbitrators; (2) that the law was, in fact, improperly applied,

leading to an erroneous outcome; and (3) a subjective element,

that is, the knowledge actually possessed by the arbitrators.

In order to intentionally disregard the law, the arbitrator

must have known of its existence and its applicability to the

problem before him."  T. Company Metals, 592 F.3d at 339.

Citation omitted.  Put another way, under Second Circuit

doctrine, district courts should find manifest disregard only

in "Those exceedingly rare instances where some egregious

impropriety on the part of the arbitrators is apparent" and not

"Merely where the arbitration panel made the wrong call on the

law."  Goldman Sachs Execution & Clearing L.P. v. Official

Unsecured Creditors' Committee of Bayou Group LLC, 491 F.App'x

201, at 203 to 04 (2d Cir. 2012).  Citations omitted.

Here Aerotel argues that the panel manifestly

disregarded the law by failing to award it any damages with

respect to its domestic card claims, despite the panel's

finding that IDT had committed material breaches of the

D7i9aera

settlement agreement.  Aerotel argues that New York law
requires that restitution be available as a remedy in such a
situation.  As to the international claims, Aerotel argues that
the panel should have awarded-D it restitution rather than the
nearly $5.4 million in lost profits that it did award as its
remedy with respect to the international card claims.

IDT counters that the panel did not ignore or
manifestly disregard the governing law.  On the contrary, IDT
argues, the panel in fact repeatedly acknowledged, interpreted,
and applied that law, and merely applied that law in a manner
that Aerotel does not like.  IDT asserts that the panel's
application of New York law to the facts reasonably yielded the
conclusions that Aerotel was not entitled to any restitution
damages, that Aerotel was not entitled to specific performance,
that the proper measure of damages was lost profits, and that,
on the facts at hand, this justified the nearly $5.4 million
award as to international cards but no award, because there
were no nonspeculative lost profits, as to the domestic cards.
Although IDT defends the panel's decision on the merits, it
also argues that that is not the relevant inquiry here.
Particularly given the narrow scope of the Court's permissible
review of an arbitration award, IDT argues, Aerotel has failed
to make out its burden that the award should be vacated.

For the reasons that follow, the Court agrees with
IDT.  Although Aerotel vigorously critiques the decision below,

D7i9aera

and although another panel, or court, or jury, might have
resolved the case differently, Aerotel does not show that the
panel manifestly disregarded the law.  On the contrary, the
panel's interim and final awards, as well its decision on
Aerotel's motion for clarification, reflect admirable care and
attention, both to the law and the facts.  In terms of care and
attention to detail, the panel's decisions are very much on the
favorable end of the Bell curve of arbitral decisions that this
Court has reviewed.  They illustrate impressive work by the
arbitrators attempting to apply, in good faith, legal
principles to complex fact patterns.  I should add that some of
these legal principles are not elucidated in the case law with
optimum clarity, but it appears to the Court that the panel, in
good faith, attempted to apply the relevant case law.  The
panel's decisions reflect commendable thoroughness.  The
panel's decisions in sum provide substantially more than the
"barely colorable" justification required to confirm an
arbitral award.

        Let me begin first by discussing the issue of the
availability of the restitution remedy.

        Aerotel argues first that, as a matter of New York
law, once the panel found material breaches by IDT, Aerotel was
entitled to elect the remedy of restitution.  Aerotel claimed,
in its posthearing brief to the panel, that its restitution
damages would be calculated as the benefit that it had

D7i9aera

 1    conferred on IDT under the 2009 agreement.  That benefit,

 2    according to Aerotel, was the value of its release of IDT from

 3    its obligations under the earlier 2007 agreement, which, as

 4    noted, gave rise to litigation, which as resolved resulted in

 5    the 2009 settlement agreement.  Aerotel's damages expert

 6    calculated the benefit conferred by Aerotel on IDT under the

 7    2007 settlement agreement to be $20,140,227.

 8            As Judge Holwell, one of my former colleagues on this

 9    Court, has stated, "The general rule is that following

10    repudiation of a contract, the nonbreaching party may seek

11    expectation damages or restitution for the benefits she

12    conferred on the other party."  Citing:  In Re:  Asia Global

13    Crossing, LTD, 404 B.R. 335, at 341 (S.D.N.Y. 2009).  The

14    Restatement (Second) of Contracts Section 373(1) puts the point

15    this way:  "On a breach by nonperformance that gives rise to a

16    claim for damages for total breach or on a repudiation, the

17    injured party is entitled to restitution for any benefit that

18    he has conferred on the other party by way of part performance

19    or reliance."

20            The panel, here, however, did not ignore these

21    precepts.  Instead, to the contrary, it cited, and stated that

22    it was applying the language of the Asia Global Crossing case

23    and of the above provision of the second restatement of

24    contracts.  Under that language, Aerotel failed to qualify

25    restitution, according to the panel, because the panel did not

D7i9aera

1    find that the necessary preconditions for restitution to have

2    been met.  Explaining its application of the law, the panel

3    stated that "The evidence reflects that IDT's breaches did not

4    effectively deny Aerotel all, or substantially all, of the

5    benefits of the 2009 agreement.  Nor did IDT's actions

6    constitute anything resembling a repudiation."  See interim

7    award at 29.  Thus, according to the panel, it was presented

8    with a situation in which a party has the right, as a matter of

9    law, to restitution damages.  Whether or not other courts might

10   set a lower bar for restitution, the panel fairly applied the

11   language of the Asia Global decision from this district and

12   from the second restatement.  And whether the application of

13   that standard to the facts at hand was correct or incorrect on

14   the factual record here is not the decisive inquiry.  The panel

15   literally followed the language of Asia Global Crossing but did

16   not find, as a matter of fact and evidence, that IDT had

17   committed a total breach or repudiation.  As set out above, for

18   better or worse, misapplication of the law to the facts is

19   insufficient grounds for vacating an arbitral award.  There is

20   no indication whatsoever that the panel intentionally

21   disregarded the law.

22        Furthermore, as IDT points out, it is far from clear

23   that the panel was indeed even "wrong on the law," although,

24   again, such a finding would still be insufficient grounds for

25   vacation.  See Goldman Sachs Execution & Clearing, 491 F.App'x

D7i9aera

1    at 203 to 204.  As noted, the panel's decision that IDT did not

2    "repudiate" the contract, and that Aerotel was not denied all

3    or substantially all of its benefits, served as its basis for

4    concluding that the remedy of restitution was not available to

5    Aerotel.  Aerotel's claim that the panel's finding of a

6    "material breach" necessarily means that it found "total

7    breach," and that the preconditions for the availability of a

8    restitution remedy were thus met, appears to be largely a

9    dispute about semantics.  From the panel's decision, it appears

10   that, based on the record before it, the panel did not view the

11   situation as one of total breach sufficient to provide Aerotel

12   with the opportunity to enjoy the remedy of restitution --

13   despite its terming the breaches "material."

14        To be sure, as the Court acknowledges, there is some

15   degree of tension between the panel's decision.  The decision

16   states that Aerotel was not foreclosed from electing the

17   restitution remedy due to continued performance of the

18   contract.  See interim award 23 to 27.  However, the interim

19   award's later discussion of restitution appears to limit that

20   earlier finding.  In effect, the panel appears to be stating,

21   Aerotel was not foreclosed in the abstract from electing

22   restitution, but on the basis of the facts here, the contract

23   was not repudiated, and therefore restitution was not

24   available.  Agree or disagree with it, though, the panel's mode

25   of analysis is a far cry from willfully or manifestly

D7i9aera

1    disregarding the law.

2            Now Arbitrator Platto issued what he termed a

3    "Concurrence and Partial Dissent," which appears at interim

4    award 37, and I want to briefly discuss it.  That partial

5    dissent does not support Aerotel's claim of manifest disregard

6    of the law.  Arbitrator Platto dissented from the interim award

7    only as to the panel's decision to deny Aerotel any award of

8    damages with respect to domestic calling cards, without first

9    affording it an opportunity to submit briefing as to those

10   damages.  Because the panel had found a material breach by IDT

11   as to Aerotel's ability to market the domestic cards, Platto

12   felt that it would be appropriate to afford Aerotel such an

13   opportunity.  Instead, the panel's denying those damages at

14   that stage meant, Platto stated, that "Aerotel recovers no

15   damages, and IDT indeed gets the ability to market the $5

16   million of termination minutes represented by those cards for

17   its own profit."  Interim award 37.  Notably, however,

18   Arbitrator Platto stated that "This may of necessity be the

19   correct result in the end because of the absence of proof of

20   ability to sell domestic cards and to calculate damages with

21   respect thereto."  Citing the interim award at 37 to 38.

22   Arbitrator Platto later concurred with the panel's decision to

23   deny Aerotel's motion for clarification.  But he reiterated his

24   point, that with "the tribunal having found a material breach

25   on the part of IDT with regard to sales of domestic cards, the

D7i9aera

issue of whether such cards could have been sold by Aerotel

through distributor/bodega channels and whether a basis for

nonspeculative damages could have been established deserved

further explanation and consideration." Citing decision on

motion for clarification. Flaherty declaration 11 at 6.

Having reviewed the record, it is hard to argue with

Arbitrator Platto's point that additional briefing on the point

would have been useful. But that is not a basis for

overturning the arbitral award. And Arbitrator Platto's

statements reveal nothing more than Platto disagreed with the

panel majority procedural decision not to further explore the

issue of damages with respect to the domestic cards, and that

he believed that, if given the benefit of further briefing as

to that issue, he might have arrived at a different outcome

than the panel on that point. It is equally possible, however,

that Platto would have arrived at the identical outcome had the

panel adopted his preferred procedural approach of inviting

further briefing. And Arbitrator Platto said as much in his

interim award "Concurrence and Partial Dissent." See again

interim award 37 where he stated, "This may of necessity be the

correct result in the end." Platto's statements evidence only

the possibility of a moderate disagreement between the

arbitrators as to one particular issue. But he did not accuse

the panel majority of flouting the law. Platto's partial

dissent, acknowledging as it did that the panel majority's

D7i9aera

outcome might indeed possibly have proven the correct result,
if anything, reinforces that that outcome was not an outlier
beyond the reach of settled law.  Whether Platto was right or
wrong in his thinking, his dissent does not support the claim
of manifest disregard for the law.

        Again, the Court's task here is not to determine
whether the finding was correct, but whether there was a
"barely colorable justification" for so holding.  There is,
clearly, such a justification.  Even if the Court were to adopt
Aerotel's argument that the panel was incorrect as to whether
restitution was an available remedy on the facts here, there
would still be no basis for it to conclude that the panel
manifestly disregarded the law.  It acknowledged the law, and,
by all indications, tried in good faith to apply it.  That
circumstance does not describe "manifest disregard of the law."

        As a final, entirely separate point, as to
restitution, it bears mention that Aerotel's theory of
restitution appears to be flawed, a point in fact made by the
panel.  At arbitration, Aerotel, as it confirmed at argument
today, sought reinstatement of the terms of the 2007 settlement
agreement -- which included $15 million in prepaid cards that
Aerotel contends today would translate into $8 million of value
domestically and $15 million of value internationally.  But
restitution aims to restore the nonbreaching party to the
position it occupied before the contract was breached, and the

D7i9aera

1    contract here is the June 2009 settlement agreement.

2    Accordingly, a restitution here award would have restored the

3    status quo as of some point on or in June 2009, presumably with

4    Aerotel in position to pursue claims of breach of the 2007

5    agreement.  Yet Aerotel did not seek that relief.  The panel's

6    view that restitution was unavailable may have been influenced

7    by the errant conception of restitution that Aerotel pressed

8    upon it.  The Court does not rely on that point in rendering

9    decision today, but it may help explain why the panel concluded

10   that restitution, as sought by Aerotel, was unavailable, and it

11   reinforces the Court's conclusion that the panel did not act in

12   manifest disregard of the law.

13        Turning now to damages.  In light of the panel's

14   determination that restitution was not a remedy available to

15   Aerotel, its further findings are even more clearly justified.

16   After receiving extensive input from both sides and their

17   experts, the panel determined that the lost profits, in effect

18   proveable expectation damages, were the proper measure of

19   damages.  It then made a careful calculation of the lost

20   profits suffered by Aerotel, and granted Aerotel an award in

21   that amount, nearly $5.4 million, keyed to the international

22   card claims.  See the final award.

23        As to the domestic claims, the panel's reasoning was

24   simply that, on the evidence presented, Aerotel had not offered

25   a basis "other than mere speculation... to measure its lost

D7i9aera

profits on the presumed sale of domestic calling cards" despite
the fact that "New York law imposes an especially demanding
standard for the computation of lost future profits in the case
of a new business."  Interim award 33 to 34.  In reaching this
result, the panel noted, again based on the evidence before it,
that Aerotel "Never sold any domestic cards under the contract
and, indeed, would have been met in any event with significant
restrictions on their sale."  Citing the interim award at 32.

        The panel also concluded that Aerotel had not
developed sufficient proof that IDT's breaches were the
proximate cause of any damages it suffered with respect to the
domestic cards -- unlike in the case of the international
cards.  Quoting the interim award at 23, the panel wrote:  "We
find that IDT's refusal to permit Aerotel to market domestic
calling cards in the manner that Aerotel wished... constituted
a material breach of the agreement.  We are unable to conclude,
however, that this breach proximately caused compensable loss."
Although that finding may perhaps be fairly disputed, it, too,
does not evince a "manifest disregard of the law."

        Turning finally to specific performance.

        Aerotel argues that the panels's failure to award
Aerotel the remedy of specific performance with regard to the
domestic cards warrants vacating the award.  Aerotel argues
that the panel "exceeded its powers, or so imperfectly executed
them, that a mutual, final and definite award upon the subject

D7i9aera

matter submitted was not made," quoting 9 U.S.C. Section

10(a)(4), in violation of Section 10 of the F.A.A.  On this

issue, Aerotel seizes on the panel's statement, cited above,

that there was "No precedent for a piecemeal remedy of damages

for one breach and specific performance for the other."  Now,

the parties' agreement granted the panel broad discretion to

award remedies provided by New York law, and, as Aerotel notes,

"New York law gives arbitrators substantial power to fashion

remedies that they believe will do justice between the parties,

citing Sperry International Trade, Inc. v. Government of

Israel, 689 F.2d 301 at 306 (2d Cir. 1982).  On this basis,

Aerotel argues, in essence, that the panel could have awarded

specific performance and therefore argues that the panel should

have awarded specific perform for the domestic card claims in

order to compensate it.  Aerotel points out that specific

performance is an appropriate remedy where no monetary award is

available.

        IDT, for its part, fairly responds that this was not a

situation in which no adequate remedy at law existed, and thus

that specific performance was unwarranted.  Rather, IDT

asserts, "Aerotel simply failed to carry its burden of proof

regarding its entitlement to that remedy."  The Court agrees

that an adequate remedy at law existed:  Had Aerotel

sufficiently demonstrated as a matter of fact that IDT's

breaches as to the domestic cards were the proximate cause of

D7i9aera

1   its damages, and had Aerotel met its burden to show, on more

2   than a speculative level, the amount of those damages, Aerotel

3   would have been entitled to such damages.  In the panel's view,

4   however, Aerotel did not make those showings.

5          Furthermore, importantly, it does not logically follow

6   from the fact that the panel had the authority to award

7   specific performance as a remedy that the panel manifestly

8   disregarded the law when it chose not to do so.  As the panel

9   pointed out in denying, unanimously, Aerotel's motion for

10  clarification, Aerotel itself had previously argued that

11  specific performance was not appropriate in this situation.  In

12  its posthearing brief, Aerotel devoted two paragraphs to a

13  discussion of why an adequate remedy at law existed, and why

14  the situation was, for various reasons, not one where it would

15  be "proper" for the panel to order specific performance.

16  Citing Aerotel's posthearing brief at 6 to 7, reproduced at

17  Laffey declaration Exhibit 9.  Aerotel intended that argument

18  to apply to all of its claims, but the logic was fairly applied

19  here by the panel to its domestic card claims.  In other words,

20  Aerotel told the panel not to award specific performance.  In

21  so doing, it took off the table a viable remedy, one that

22  potentially could have had value to Aerotel, including by

23  putting back in its hands the prepaid cards that it had yet to

24  energetically market.  But Aerotel's disclaimer of that remedy

25  was reason enough for the panel not to impose it.  Thus, when

D7i9aera

1    the panel, for independent reasons, found that restitution was

2    unavailable and that lost profits did not result in a positive

3    award for Aerotel, Aerotel was left with nothing.  Under these

4    circumstances, Aerotel's litigation strategy, to take a viable

5    remedy off the table, precludes it from arguing that failure to

6    award that remedy was error, let alone manifest disregard of

7    the law.  The Court finds that the denial of specific

8    performance here was justifiable, and in any event falls far

9    short of the high standard required to vacate an arbitration

10   award.

11           That leads me to the question of confirmation of the

12   award.

13           Aerotel has requested that, should the Court deny its

14   petition, as it has, it confirm the panel's final award of

15   $5,391,529 pursuant to Section 9 of the F.A.A.  See petition

16   paragraph 1, note 2 and page 8(c).  IDT seeks the same relief.

17           The Court has, as demonstrated by the foregoing

18   analysis, closely reviewed the award here.  The Court has

19   determined that it should be confirmed.  The FAA provides a

20   "streamlined" process for a party seeking a "judicial decree

21   confirming an award, an order vacating it, or an order

22   modifying or correcting it."  Hall Street Associates L.L.C.  V.

23   Mattell, Inc., 552 U.S. 576 at 582 (2008).  "Confirmation of an

24   arbitration award is a summary proceeding that merely makes

25   what is already a final arbitration award a judgment of the

D7i9aera

1    Court, and the Court must grant the award unless the award is

2    vacated, modified, or corrected."  Citing D. H. Blair & Company

3    v. Gottdiener, 462 F.3d 95 at 110 (2d Cir. 2006).  Because

4    "arbitration awards are not self-enforcing," Hoeft v. MVL

5    Group, Inc., 343 F.3d 57 at 63 (2d Cir. 2003), overruled on

6    other grounds by Hall Street, 552 U.S. 576, "They must be given

7    force and effect by being converted to judicial orders by

8    courts."  D.H. Blair, 462 F.3d at 104.  The Court now does so,

9    confirming the panel's award to Aerotel of $5,391,529 in lost

10   profits inclusive of interest at 9 percent per annum through

11   March 15, 2013.

12           Next I turn to the issue of costs and attorneys' fees.

13           IDT requests that the Court award costs and attorneys'

14   fees arising from this motion.  Its only basis appears to be

15   its characterization of Aerotel's motion as "frivolous."  A

16   prevailing party is ordinarily not entitled to attorneys' fees

17   except where expressly provided by statute or contract.  See In

18   Re: Arbitration Between Westchester Fire Insurance Company v.

19   Massamon Insurance Company, Inc., 420 F.Supp. 2d 223, 227

20   (S.D.N.Y. 2005).  Citing International Chemical Workers Local

21   227 v. BASF Wyandotte Corp., 774 F.2d 43, at 47 (2d Cir. 1985).

22   The F.A.A. contains no such provision.  See Abondolo v. H. & M.

23   S. Meat Corp., No. 07 Civ. 3870 (RJS), 2008 Westlaw 2047612 at

24   4 (S.D.N.Y. May 12, 2008); and Westchester Fire Insurance Co.,

25   420 F.Supp. 2d at 227 (collecting cases).  Courts may, however,

D7i9aera

1   award fees pursuant to their inherent equitable authority

2   "where the parties acted in bad faith, vexatiously, wantonly,

3   or for oppressive reasons, citing Kerin v. U.S.Postal Service,

4   218 F.3d 185, 190 (2d Cir. 2000).  Quoting Alyeska Pipeline

5   Service Co. v. Wilderness Society, 421 U.S. 240, at 258 to 259

6   (1975).  The Second Circuit has held that fees may be awarded

7   pursuant to this inherent equitable authority in the context of

8   a petition to confirm an arbitration award "when a challenger

9   refuses to abide by an arbitrator's decision without

10  justification."  International Chemical Workers Local 227, 774

11  F.2d at 47.

12         There is no such allegation here.  Although the Court

13  has denied Aerotel's motion to vacate the award, it does not

14  regard Aerotel's motion as frivolous or anything close to it.

15  Aerotel had a "justifiable basis" for bringing this litigation

16  in light of the panel's decision.  The Court does not regard

17  Aerotel's petition here as frivolous, but instead, just

18  ultimately not meritorious.  Therefore, Aerotel should not be

19  required to pay IDT's costs and attorneys' fees and the Court

20  declines to so order.  See International Chemical Workers Local

21  227, 774. F.2d at 47.  I, therefore, conclude the following.

22  For the foregoing reasons, the Court denies Aerotel's motion to

23  vacate the arbitral award and hereby confirms that award of

24  $5,391,529.  Therein ends the decision.

25         Beginning with plaintiffs, is there anything further

D7i9aera

1    that the Court needs to tend to?

2              MR. OSTRAGER:  No, your Honor.

3              THE COURT:  Anything further from the defense?

4              MR. LAFFEY:  No, your Honor.  Thank you very much.

5              THE COURT:  Thank you.  We stand adjourned.

6              I want to commend both parties, really and truly

7    excellent briefs.  I can only rule in one side's favor on the

8    merits, but I want to tell you both just as a matter of sheer

9    caliber of briefing, this is as good as it gets.  I really am

10   grateful for the very high quality briefing.

11             (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25